**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**KATHLEEN KAZMIERCZAK and**
**MARIE PETRILLO,**

                                **Plaintiffs**                    **02-CV-0003A(Sr)**

**v.**

**HOPEVALE, INC., and**
**HOPEVALE UNION FREE SCHOOL DISTRICT,**

                                **Defendants.**

_____

## <u>DECISION AND ORDER</u>

        In accordance with 28 U.S.C. § 636(c), the parties have consented to

have the undersigned conduct all further proceedings in this case, including entry of

final judgment.  Dkt. #8.


        Plaintiffs commenced this action seeking damages pursuant to Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), the Age

Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq*. ("ADEA"), and the

New York State Human Rights Law, Article 15 of the New York State Executive Law

("NYSHRL").  Dkt. #1.  Specifically, plaintiffs complain of: (1) age discrimination

pursuant to the ADEA; (2) sex discrimination pursuant to Title VII; (3) retaliation

pursuant to Title VII; (4) retaliation pursuant to the ADEA; (5) age discrimination

pursuant to the New York Human Rights Law; (6) sex discrimination pursuant to the

New York Human Rights Law; and (7) retaliation pursuant to the New York Human Rights Law.  Dkt. #1.

Currently before the Court is defendant Hopevale Union Free School District's ("School's"), motion for summary judgment (Dkt. #14); Hopevale, Inc.'s ("Hopevale's"), motion for summary judgment (Dkt. #16); and plaintiffs' motion for partial summary judgment against Hopevale.  Dkt. #20.  For the following reasons, defendants' motions are granted and plaintiffs' motion is denied.

## BACKGROUND

Defendant Hopevale is a non-profit corporation providing residential care and services to abused, destitute, delinquent, abandoned or dependent girls.  Dkt. #24, ¶ 5.  Defendant School is a special act school district created by the New York State Legislature to educate students placed by the New York State Family Court, Department of Social Services, Department of Child & Family Services or local school districts.  Dkt. #24, ¶ 4.

Plaintiffs were hired by the School in 1984 to work as cleaners for Hopevale, which contracted their services to the School at an hourly rate of $4.50.  Dkt. #33, ¶¶ 1 & 2; Dkt. #35, ¶ 4.  Plaintiffs' receive one paycheck from Hopevale for their work for both Hopevale and the School.  Dkt. #35, ¶ 6.  As part of his responsibilities for Hopevale, Kenneth Mangione, Administrator of Finance and Support Services for Hopevale and Business Manager for the School, supervised plaintiffs' work for both Hopevale and the School until July, 2002.  Dkt. #17, ¶ 5.

John Borowski was hired as a cleaner by the School on April 29, 1985 at an hourly rate of $5.00.  Dkt. #20, Exh. 14.   At that time, plaintiffs were still earning $4.50.  Dkt. #20, Exh. 15& 16.  When Mr. Borowski was transferred to a maintenance position on October 6, 1986, he received a salary increase to $6.25 per hour, while Ms. Kazmierczak's hourly rate as a cleaner was $5.375 and Ms. Petrillo's hourly rate as a cleaner was $5.176.  Dkt. #20, Exh. 14-16.  When Mr. Borowski resigned in 1988, he was earning $7.15 per hour, while Ms. Kazmierczak was earning $6.15 per hour and Ms. Petrillo was earning $5.92 per hour.  Dkt. #20, Exh. 14-16.

James McGowan became principal of the School in 1992, which is the same year in which the School expanded into a new building and Hopevale took over the building vacated by the School.  Dkt. #24, ¶ 13; Dkt. #33, ¶ 8.  At that time, plaintiffs' hours were increased at the School and they were also assigned cleaning duties at Hopevale's offices.  Dkt. #24, ¶ 14.  Since then, plaintiffs have been scheduled to work two hours a day for Hopevale and six hours a day for the School.  Dkt. #24, ¶ 19.  Plaintiffs generally work from 6:30 a.m. until 8:30 a.m. cleaning the offices at Hopevale and from 4:00 p.m. until 10:00 p.m. cleaning the School.  Dkt. #20, ¶ 9; Dkt. #24, ¶ 15.  Plaintiffs are the only people regularly scheduled to be working in the School after hours.  Dkt. #24, ¶ 16.

In May of 1997, Mr. Mangione and Mr. McGowan suggested that plaintiffs' work schedule be consolidated into an eight-hour shift from 3:30 p.m. until 11:30 p.m. Dkt. #14, Exh. H; Dkt. #24, ¶ 33; Dkt. #30, Exh. 10, pp.73-76.  As part of this proposal, plaintiffs would no longer be paid separate hourly rates from the School and Hopevale,

but would be reimbursed for all of their time at Hopevale's lower rate of pay.  Dkt. #33, ¶ 32.  During a meeting to discuss this proposal, plaintiffs allege that Mr. Mangione and Mr. McGowan commented that plaintiffs were expendable and getting old, and had to be able to "bend and stretch."  Dkt. #33, ¶ 32.  Plaintiffs opposed the proposal to consolidate their hours and pay rate and, after meeting with Hopevale's Executive Director, Stanfort Perry, the proposal was withdrawn.  Dkt. #24, ¶ 34; Dkt. #30, Exh. 10, p.76 & Exh. 11, p.32.

Ray Murphy was hired by Hopevale on May 28, 1997 at the age of 32 for a temporary summer maintenance position earning $6.20 per hour.  Dkt. #14, Exh. J; Dkt. #20, Exh. 6, p.84 & Exh. 18.  As of July 1, 1997, Ms. Kazmierczak was earning $11.11 per hour from the School and $8.60 from Hopevale, while Ms. Petrillo was earning $10.72 from the School and $8.60 from Hopevale.  Dkt. #20, Exh. 15-16.

Plaintiffs allege that Mr. McGowan entered the building after hours to intentionally scare plaintiffs.  Dkt. #33, ¶¶ 1-2.  For example, plaintiffs allege that Mr. McGowan hid in a dark lavatory on June 16, 1997 and often walked the halls in his stocking feet.[1]  Dkt. #33, ¶¶ 1, 26-27 & Exh. 2. In a note dated June 17, 1997, plaintiffs requested that Mr. Caliguri instruct Mr. McGowan to announce his presence at night over the red telephone so that he would not scare them.  Dkt. #33, ¶ 8.  Plaintiffs wrote a letter to Mr. Perry in October of 1997, informing him of two separate incidents in which

---

[1] At their depositions, Mr. Mangione and Mr. Caliguri stated that Mr. McGowan explained to them that he removed his shoes upon entering the building when they were wet or covered with snow.  Dkt. #16, Exh. I, p.133; Dkt. #33, Exh. 7, p.102.

Mr. McGowan entered the building without announcing himself.  Dkt. #33, ¶ 10.  On

November 5, 1997, plaintiffs tied a set of bells to the front door so that they would hear

Mr. McGowan enter the building.  Dkt. #33, ¶ 28.  Mr. McGowan complained to Mr.

Caliguri, who forbid plaintiffs from repeating this action even though plaintiffs explained

that they had done so in order to prevent Mr. McGowan from scaring them.  Dkt. #33, ¶

28.  During this time period, *i.e.*, 1997-1998, Mr. Caliguri was aware of four formal

complaints against Mr. McGowan involving inappropriate kissing (two incidents),

statements, and staring, at least one of which resulted in discipline.  Dkt. #33, Exh. 7,

pp.107-12.  However, plaintiffs admit that Mr. McGowan never made sexual advances,

asked for sexual favors, or physically touched them.  Dkt. #16, Exh. G, pp.553-54 &

Exh. H, pp.72-73, 82.

On June 2, 1998, while questioning Mr. Mangione regarding the pay rates

shown on their pay stubs, Mr. Mangione allegedly asked plaintiffs, "why don't you just

quit?"  Dkt. #33, Exh. 2.

On July 1, 1998 plaintiffs received a pay increase from Hopevale which

raised their hourly rate to $8.86.  Dkt. #20, Exh. 15-16.  On October 19, 1998, Ray

Murphy's hourly wage as a cleaner was increased to $6.65.  Dkt. #20, Exh. 18.

On November 23, 1998, Mr. McGowan allegedly scared plaintiffs as they

were leaving the building.  Dkt. #33, ¶ 29.  In December of 1998, Mr. McGowan

allegedly scared Ms. Petrillo as she was exiting a lavatory.  Dkt. #33, ¶ 30.  When she

complained that she could have had a heart attack, he allegedly responded, "yeah, you could." Dkt. #33, ¶ 30. Plaintiffs assert that they subsequently found an article entitled, "How to survive a heart attack when you're alone," in their mailbox. Dkt. #33, ¶ 30. The article is photocopied onto a sheet of paper with the following handwritten caption: "To: All Staff; From: JAC; Date: 9/28/2000; FYI." Dkt. #33, Exh. 1 & 7, p.162-63.

On January 1, 1999, plaintiffs allege that Mr. McGowan was waiting for plaintiffs in a darkened hallway outside the lavatory. Dkt. #33, Exh. 2. When Ms. Kazmierczak exited the lavatory, she exclaimed: "Are you crazy?" Dkt. #33, Exh. 2. Mr. McGowan responded, "I came down here so I wouldn't scare you." Dkt. #33, Exh. 2. On January 19, 1999, Mr. McGowan, in his stocking feet, allegedly told plaintiffs, "I'm smiling . . . I'm not mean." Dkt. #33, ¶ 31. The next day, Ms. Kazmierczak telephoned Mr. Caliguri to report that Mr. McGowan had scared her. Dkt. #33, ¶ 32.

During a meeting in February of 1999, plaintiffs allege that Mr. Mangione again commented that plaintiffs were "getting old," and had to be able to "bend and stretch." Dkt. #14, Exh. C, pp.596-97.

In March of 1999, Hopevale gave Mr. Murphy additional hours and assigned him to clean Building 20, which had recently been renovated. Dkt. #20, ¶ 11. This resulted in a cost savings for Hopevale, as it was able to pay Mr. Murphy his regular hourly rate, whereas plaintiffs were receiving two hours per week overtime to complete this work. Dkt. #17, ¶¶ 26-27; Dkt. #30, Exh. 9, p.355 & Exh. 11, p.328.

Plaintiffs concede that they had expressed concern to Mr. Perry about their ability to complete their cleaning duties during their scheduled hours.  Dkt. #16, pp 45-46.   Mr. Murphy continues to clean Building 20 during his regularly scheduled hours, spending approximately one-half hour per day on this task.  Dkt. #30, Exh. 2, ¶ 20.

In a memorandum summarizing a meeting on March 25, 1999, Mr. Mangione wrote the following:

> This memo will serve to summarize the results of the meeting held today between yourselves and Joe Caliguri and Jim McGowan from the school and Stanfort Perry and me from Hopevale, Inc.
>
> 1.      Your work schedule at the school will be from 4:00 PM until 10:00 PM, Monday through Friday.
>
> 2.      Mid way through your school work day, you may take a one-half hour break.  This break is not to be taken at either the beginning or end of your work day.
>
> * * *
>
> 4.      We will hold regular meetings to review Hopevale and School items of interest and/or concern on the first and third Tuesdays of the month.  I suggest that we hold these meetings at 7:30 AM so that you will not have to make a special trip here.
>
> 5.      Due to constraints of time we were not able to deal with whether or not you feel that you can meet all of the school's cleaning needs.

Dkt. #33, Exh. 2.  At his deposition, Mr. Mangione testified that Hopevale did not have a written policy with respect to lunch breaks and formulated this policy with respect to plaintiffs in response to concerns regarding the appropriateness of the School paying plaintiffs for a one hour break during the course of a six hour shift.  Dkt. #16, Exh. I, pp.320-24.

Ray Murphy transferred to a maintenance position with Hopevale as of July 1, 1999, earning $8.77 per hour.  Dkt. #20, Exh. 18.  Despite this transfer, Mr. Murphy referred to himself as a cleaner on his time sheets and continued to wear an employee name tag identifying him as a cleaner.  Dkt. #20, ¶¶ 15, 20.  However, Mr. Murphy affirms that his position requires him to deliver meals, food and supplies to the cottages; perform minor repairs to sinks, toilets, doorbells, lights, and windows; move furniture; maintain lawn equipment; paint buildings; mow and trim the lawn in the summer; and shovel and salt walkways in the winter.  Dkt. #30, Exh. 2, ¶¶ 6-19.   Mr. Mangione avers that maintenance workers have different work hours and responsibilities than cleaners.  Dkt. #17, ¶¶ 17-19.  Specifically, Mr. Mangione affirms that maintenance workers are responsible for the upkeep and proper operation of the physical plant of Hopevale, including the administrative office building, seven residential cottages, the Family Activity Center, Building 20 and the health clinic.  Dkt. #17,  ¶¶ 17-19.  Mr. Mangione concedes that maintenance workers perform occasional cleaning tasks as needed.  Dkt. #17, ¶ 19.

In addition to their hourly salary, plaintiffs were included in the distribution formula for a bonus paid by the School when it ended the year with a budget surplus.  Dkt. #24, ¶¶ 21-22.  Plaintiffs also received a longevity bonus from Hopevale which was pro-rated based upon hours worked for Hopevale.  Dkt. #24, ¶¶ 23-24.  Beginning in the 1999-2000 fiscal year, plaintiffs' began receiving a full longevity payment from Hopevale and no longer shared in the School's budget surplus bonus.  Dkt. #24, ¶ 25.  School Superintendent Joseph Caliguri testified at his deposition that the School decided to

stop paying the bonus to plaintiffs "because the expense was getting to the point where it would have been cheaper to engage a cleaning company compared to what the cleaners were earning."  Dkt. #14, Exh. F, p.92.

Since approximately March 4, 2000, Mr. Murphy has been receiving two hours of overtime per day to clean the Family Activity Center.  Dkt. #20, ¶ 18.  Mr. Mangione affirms that Mr. Murphy was offered the opportunity to clean the Family Activity Center when it opened because he worked alone, whereas plaintiffs worked together, and because

> Plaintiffs were unavailable to do the cleaning because of the split work schedule they had chose and fought hard to maintain.  The Family Activity Center had to be cleaned when the building was not in use.  The only feasible time to clean the building was in the early morning hours.  Since Plaintiffs already worked the early morning hours, Murphy was offered the building to clean.

Dkt. #17, ¶¶ 29, 42.  Mr. Murphy cleans the Family Activity Center from 6:00 a.m. until 8:00 a.m. each work day.  Dkt. #30, Exh. 2, ¶ 21.  Plaintiffs did not ask to clean the Family Activity Center.  Dkt. #16, Exh. H, pp.339-42.

By memorandum dated March 10, 2000, Mr. Mangione informed plaintiffs that

> Lights should be turned off when you are not in an area.  If you leave the building for dinner, all lights should be turned off.

Dkt. #33, Exh. 2.  Plaintiffs responded by informing Mr. Caliguri that they could not comply with this directive because they were afraid of Mr. McGowan lurking in the dark and scaring them.  Dkt. #33, ¶ 54.

By memo dated April 18, 2000, Mr. Mangione informed Mr. Caliguiri that he

> spoke again today with Kathy and Marie regarding their
> concerns.  They both state that Jim has continued to enter
> the school unannounced despite his statements to the
> contrary.  I have asked them to provide me with a written
> statement to that effect and to cite dates if possible.
>
> I am not sure what is going on but I feel that we need to take
> a very strong pro-active position to ward off any potential for
> any harassment charge.  I will continue to press Kathy and
> Marie for written documentation regarding their concern.  I
> suggest that we schedule a meeting with them to discuss
> this matter to insure that we are not accused of disregrard.

Dkt. #14, Exh. H.  In a memo to the file, also dated April 18, 2000, Mr. Mangione summarized the following meeting between plaintiffs:

> We then discussed the concern that they both have over Jim
> McGowan coming into the school when they are working at
> night.  They still maintain that he does not let them know
> when he is in the building.  I asked if they were referring to
> recent incidents or past incidents.  They stated that these
> occurrences continue and that they have dates when he has
> come in the building unannounced.  I again asked them to
> provide these dates as was requested in my memo to them
> on April 11th.  I specifically asked if he had ever made any
> sexual comments or any comments regarding their
> appearance.  After a long delay, they stated that he had not.

Dkt. #14, Exh. H.

In a letter dated April 17, 2000, and received April 18, 2000, plaintiffs' attorney informed Mr. Mangione that

> It is my understanding that [plaintiffs] have raised
> certain concerns with you and with Stanford Perry, the
> former executive director of Hopevale, relative to lighting
> conditions.
> There are occasions when Mr. McGowan will enter
> the building unannounced and has remained in various
> building areas without announcing himself or letting Ms's.
> Kazmierczak or Petrillo aware [sic] that he is in the building.

> As you can appreciate, they are basically alone in the building and have concerns about their security and safety issues.
>
> My clients want to be sure where Mr. McGowan is during the times that he is in the building.
>
> My clients have been put in a position where Mr. McGowan could be anywhere in the building unannounced, without shoes, socks, behind various rooms in the dark and to be quite honest, they are fearful.
>
> It is under these circumstances that you can appreciate that they desire that there be proper lighting conditions in general areas.

Dkt. #33, Exh. 3.

In response to that letter, Mr. Caliguri reminded Mr. McGowan to "try to announce himself when entering the building."  Dkt. #33, ¶ 20.  However, Mr. Mangione and Mr. Caliguri both stated that they did not know why a principal would have to announce himself when entering his own building.  Dkt. #33, ¶ 23.  With respect to plaintiffs' security concerns, Mr. Caliguri testified at his deposition that

> There is no security for the School at night.  There is no need for security at [t]he School at night. . . . All of my 18 years there we never had a problem or an incident that required security.

Dkt. #33, Exh. 7, p.100.

During a meeting with plaintiffs in April of 2000, Mr. Mangione allegedly informed plaintiffs that he doesn't "get 10 extra dollars for dealing with [plaintiffs] . . . I'm sick of getting harassed by the School."  Dkt. #33, Exh. 2.  When plaintiffs informed Mr. Mangione that they were afraid of Mr. McGowan, Mr. Mangione allegedly responded that he wasn't going "to sit across from a federal court judge" over this.  Dkt. #33, Exh. 2.  Mr. Mangione denies these comments.  Dkt. #16, Exh. I, p.257.

Plaintiffs were informed that Mr. Regula, the School's Assistant Principal, would replace Mr. McGowan as their supervisor by memo dated May 1, 2000.  Dkt. #33, ¶ 25 & Exh. 2.

On May 9, 2000, after plaintiffs made numerous complaints about windows and doors being left open in the school, plaintiffs requested a meeting with Mr. Regula in which they suggested that maintenance secure the building after classes. Dkt. #33, ¶ 52.

On or about June 9, 2000, Hopevale's Executive Director, Mark O'Brien, and Elizabeth Rath met with the plaintiffs to discuss their concerns regarding lighting in the school, Mr. McGowan's failure to announce his presence in the school after hours, Mr. Mangione's objectionable comments and communication and training issues.  Dkt. #20, Exh. 8, No. 18; Dkt. #33, ¶ 57.

> As a result of this meeting, Plaintiffs were instructed to leave the lights in the hallways of the school on until they completed cleaning the school.  In regard to their safety concerns, Plaintiffs were instructed to carry personal cellular phones while working, and were made aware of the fact that there was a telephone in each classroom.  Plaintiffs were also issued 2-way radios with which they are able to contact the Night Office.  Further, O'Brien addressed Plaintiffs' allegations regarding alleged comments made by Mangione, and considered the matter resolved.

Dkt. #20, Exh. 8, No.18; Dkt. #33, ¶ 57.

Ray Murphy received a pay increase to $9.03 on July 1, 2000.  Dkt. #20, Exh. 18.

Plaintiffs filed charges of discrimination with the EEOC on August 1, 2000, alleging ongoing age and sex discrimination since 1986.  Dkt. #16, Exh. C.

Although plaintiffs are unsure of the date, they recall an incident in 2000 where they were washing windows and Mr. Regula commented, in sum and substance, "what are you doing sunbathing, look Rich is working hard over here because Rich Dobry was outside working on the flowers."  Dkt. #16, Exh. A, p.199 & Exh. B, p.294 & Exh. G, pp.564-65 & Exh. H, pp.143-44.

On October 4, 2000, after receiving a complaint from plaintiffs regarding security, Mr. Regula allegedly replied, "What do you want me to do about it."  Dkt. #33, ¶ 60.  He informed plaintiffs that he tells the teachers to close the windows and doors, but they do not do it.  Dkt. #33, ¶ 60.

Ray Murphy received a pay increase to $9.39 per hour on October 28, 2000.  Dkt. #20, Exh. 18.  Plaintiffs' received a pay increase to $9.21 for their work at Hopevale on October 28, 2000.  Dkt. #20, Exh. 15-16.

In a memorandum dated November 3, 2000, in response to plaintiffs memorandum regarding another employee's presence in the building at 5:20 p.m., Mr. Regula informed plaintiffs that

> School staff have a right to be in the school building either before, after or during normal school hours.  They are not obligated to check in and out with the cleaning staff.

Dkt. #33, Exh. 1.  Plaintiffs responded that

> We are not saying staff cannot be in Building. Kathy and I
> work alone and our hours are from 4:00 p.m. until 10:00 p.m.
> For our safety and security and schools [sic] we would like to
> know if someone is in Building.

Dkt. #33, Exh. 1.

On November 10, 2000, plaintiffs allege that Ken Mangione asked them to meet with him at a restaurant to discuss their discrimination charges "off the record." Dkt. # 20, Exh. 11; Dkt. #33, ¶ 35 & Exh. 2.  Plaintiffs refused.  Dkt. #33, ¶ 35.  Mr. Mangione admits that he inquired into the status of plaintiffs' EEOC charges, but denied asking plaintiffs to meet.  Dkt. #16, Exh. I, p.173, 232-33.

During the 2001 Easter break, Mr. Regula instructed plaintiffs to log all the work they performed at the school.  Dkt. #33, Exh.2.

On April 11, 2001, Mr. Mangione allegedly "offered" plaintiffs the opportunity to clean the Family Activity Center in return for the withdrawal of their EEOC charges.  Dkt. #33, Exh. 2.  Mr. Mangione denies this allegation.  Dkt. #16, Exh. I, p.235.

On May 4, 2001, plaintiffs observed the following written on a bathroom stall: "The school will be blown up on Monday you bitches."  Dkt. #33, ¶ 74.  On Monday, plaintiffs observed an open window in the building and called the Night Office, which refused to check the building.  Dkt. #33, ¶ 76.  Mr. Caliguri explained that

because of the nature of their school, that kind of remark was not uncommon.  Dkt. #33, Exh. 7, p.176-78.

Mr. Regula became principal of the School upon Mr. McGowan's retirement in June of 2001.  Dkt. #24, ¶ 10.

Plaintiffs were evaluated on September 20, 2001.  Dkt. #24, ¶ 35. Plaintiffs received ratings of good to excellent in every category in which they were evaluated.  Dkt. #14, Exh. H; Dkt. #24, ¶ 35.  Mr. Mangione testified at his deposition that plaintiffs were evaluated in order to comply with the Joint Commission and Accreditation, Health Care Organization requirements that support staff be evaluated at least every other year.  Dkt. #16, Exh. I, pp.160-61.

In a memorandum dated October 1, 2001, Mr. Mangione responded to plaintiffs' concerns regarding open doors and windows as follows:

> please be assured that security (both staff and student) is a very important matter.  While I cannot guaranty [sic] that windows and doors will not be left open or unlocked, I will meet with Mr. Caliguri and Mr. Regula to develop a procedure to minimize the risk.  I also ask that you make a written record of the date, time and location of any door and/or window found open after the close of school.  This information should be forwarded to me as soon as possible. Please keep in mind that staff are still working after the official close of school so all doors may not be locked at 4:00 PM.  I also request that you take five (5) or ten (10) minutes at the start of your workday to walk through the building and check to make sure that all doors and windows are closed and locked.

Dkt. #33, Exh. 2.

Plaintiffs received a Dismissal and Notice of Rights to Sue from the EEOC with respect to Hopevale on October 3, 2001.  Dkt. #1, ¶ 3.

On October 11, 2001, Mr. Mangione informed plaintiffs of the following:

1.      I have spoken to both Mr. Caliguri and Mr. Regula regarding windows being left open and/or unlocked. They have both informed me that they regularly remind staff to make sure that windows are closed and locked before staff leave for the day.  In addition, staff are individually spoken to after a notice from you is received regarding a particular window.

* * *

3.      Regarding Eric . . . coming in at 9:55 "without prior knowledge", I do not know what you are saying. Certain staff, with the permission of school administration, are permitted to return to work after hours.  It is not their responsibility to inform you beforehand that they intend to come back to work nor are they required to seek you out to inform you that they are in the building.

Dkt. #33, Exh. 3.

Plaintiffs received a Dismissal and Notice of Rights to Sue from the EEOC with respect to the School on October 29, 2001.  Dkt. #1, ¶ 3.

By memorandum dated October 30, 2001, Mr. Mangione informed plaintiffs that

In order to better track areas of performance which need extra attention or areas of performance which do not meet the expectations of Hopevale or Hopevale School, the attached [Cleaning Service Report] form will be used.  Staff or administration that wish to report an area that they feel

> needs additional attention will be asked to complete a
> Cleaning Service Report.  These reports will be forwarded to
> me and I will in turn, review them with you.

Dkt. #33, Exh. 3.  Plaintiffs responded that they thought this report "seems to target us

unfairly," noting that maintenance issues are addressed *via* "maintenance request."

Dkt. #33, Exh. 4.

In a memorandum dated November 9, 2001, Mr. Mangione informed

plaintiffs that

> The Cleaning Service Report was designed to serve two (2)
> purposes:
>
> a.    It will be used to request an extra service that is not
>        part of the normal cleaning process.
>
> b.    It will be used to report areas that are considered part
>        of the normal cleaning process (i.e. emptying trash,
>        replacing toilet paper, soap, cleaning floors, etc.)
>        These items are considered deficiencies since they
>        are part of the normal cleaning process.  They are not
>        requests.

Dkt. #33, Exh. 2.

Plaintiff commenced this action on January 2, 2002.  Dkt. #1.

On or about January 17, 2002, Mr. Dobry cleaned the mess from a sewer

back up at the School.  Dkt. #33, ¶ 119.  On January 24, 2002, Mr. Mangione informed

plaintiffs that there had been another sewage backup which they would need to clean

up.  Dkt. #33, ¶ 117.  Mr. Regula instructed plaintiffs to mop it up and use Crew, one of

the solvents plaintiffs use regularly.  Dkt. #33, ¶ 121.  Plaintiffs were not provided with

protective equipment and became covered in raw sewage.  Dkt. #33, ¶ 122.  Plaintiffs

sought hospital treatment following this exposure.  Dkt. #33, ¶ 125.  They also

contacted OSHA, which cited Hopevale for multiple serious violations, including failure

to train cleaners regarding exposure to blood or other potentially infectious materials;

failure to provide cleaners with personal protective equipment to clean up raw sewage;

failure to afford cleaners with appropriate medical care following exposure to raw

sewage; and failure to develop and implement a written Hazard Communication

Program for cleaners working with hazardous chemicals.  Dkt. #33, ¶ 88 & Exh. 16.


On July 7, 2003, plaintiffs new supervisor, Mr. Koczwara, informed

plaintiffs that they would not be permitted to start work at the School earlier during the

summer, even though classes end earlier.  Dkt. #33, Exh. 17, ¶ 11.


On July 8, 2003, plaintiffs allege that although he admitted that

maintenance forgot to lock the front door, Mr. Koczwara yelled at plaintiffs for leaving

the front door open overnight, even though they did not possess the ratchet key that is

needed to lock or unlock this door.  Dkt. #33, Exh. 17, ¶¶ 12-13.  Plaintiffs were then

given a key and instructed to "lock up from now on."  Dkt. #33, Exh. 17, ¶¶ 16-17.


## DISCUSSION AND ANALYSIS

## Summary Judgment Standard

_____Summary judgment is appropriate "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the

court must assess whether there are any material factual issues to be tried while

resolving ambiguities and drawing reasonable inferences against the moving party, and

must give extra latitude to a pro se plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 799

(W.D.N.Y. 1997) (internal citations omitted).


A fact is "material" only if it has some effect on the outcome of the suit.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*,

140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*,

502 U.S. 849 (1991).


Once the moving party has met its burden of "demonstrating the absence

of a genuine issue of material fact, the nonmoving party must come forward with

enough evidence to support a jury verdict in its favor, and the motion will not be

defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of

conjecture or surmise."  *Bryant*, 923 F.2d at 982.   A party seeking to defeat a motion

for summary judgment

> must do more than make broad factual allegations and
> invoke the appropriate statute.  The [party] must also show,
> by affidavits or as otherwise provided in Rule 56 of the
> Federal Rules of Civil Procedure, that there are specific
> factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

**Eleventh Amendment Immunity**

The School District argues that plaintiffs' ADEA and state law claims are barred by the Eleventh Amendment to the United States' Constitution.  Dkt. #15, pp.7-8.

Plaintiffs respond that the School District is not an arm of the state for Eleventh Amendment purposes.  Dkt. #32, pp.29-30.

The Eleventh Amendment[2] of the United States Constitution bars suit in federal court by an individual against a state or its agencies, unless the state has waived its sovereign immunity by consenting to suit in federal court or Congress has authorized such a suit pursuant to a valid exercise of its power.  *Board of Trustees of the Univ. of Alabama v. Garrett,* 531 U.S. 356, 363-64 (2001)*; College Savs. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 680 (1999); *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  There is no suggestion that New York State has consented to suit in federal court and the Supreme Court has determined that Congress did not have authority to abrogate states' Eleventh Amendment sovereign immunity to suit pursuant to the ADEA.[3]  *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 67 (2000).  Thus, this court would lack subject matter jurisdiction over any action against the state or its agencies which was brought pursuant to the ADEA or state law.

---

[2] The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

[3] The Supreme Court has upheld Congress's abrogation of Eleventh Amendment immunity with respect to Title VII claims.  *Fitzpatrick v. Bitzer*, 427 U.S. 445, 452 (1976).

"An official arm of a state enjoys the same Eleventh Amendment immunity from suit in federal court as is enjoyed by the state itself."  *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 414 (2d Cir. 1999); *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280-281 (1977) ("The issue here thus turns on whether the Mt. Healthy Board of Education is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend.").  The following six factors are considered in determining whether an entity is considered an "arm of the state": (1) how the entity is referred to in its documents of origin; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's financial obligations are binding on the state.  *McGinty v. State of New York,* 251 F.3d 84, 95-96 (2d Cir. 2001).

> If these factors point in one direction, the inquiry is complete. If not, a court must ask whether a suit against the entity in federal court would threaten the integrity of the state and expose its treasury to risk.  If the answer is still in doubt, a concern for the state fisc will control.

*Id.* at 96 (internal citations omitted).

In *Fay v. South Colonie Central School District*, the school district argued that it was entitled to immunity as "a branch of state government charged by the state with the local administration of its educational system." 802 F.2d 21, 27 (2d Cir. 1986), *overruled on other grounds by Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768 (2d Cir.

2002).  The Court of Appeals for the Second Circuit rejected this argument, stating

> Inferior government bodies do not share in Eleventh
> Amendment immunity simply because they receive state
> funds.  Moreover, being a steward of state education policy
> does not make the school district an alter ego of the state
> and the school district's argument on this point is singularly
> unpersuasive.

*Id.* (internal citations omitted).


        In a subsequent unpublished opinion which did not cite *Fay*, the Court of

Appeals upheld the district court's determination that a school district was immune

under the Eleventh Amendment for a claim brought pursuant to the ADEA, stating

> The district court found that [the school district] is an arm of
> the state, *Lanza v. Wagner*, 11 N.Y.2d 317, 326-27 . . .
> (1962),[4] and hence immune to suit under the Eleventh
> Amendment, *Kimel v. Florida Bd. of Regents*, 528 U.S. 62,
> 67 (2000).  We agree and therefore conclude that the district
> court correctly dismissed the ADEA claim against [the school
> district].

*Scaglione v. Mamaroneck Union Free School District*, 47 Fed. Appx. 17, 18, 2002 WL

31060608, at *1 (Sept. 17, 2002).

---

[4] In *Lanza v. Wagner*, the Court of Appeals determined that
        It is perfectly clear, as all the members of the court agree, that . . .
        members of New York City's Board of Education are not "city officers"
        within the meaning of that section.  On the contrary, it has long been
        settled that the administration of public education is a State function to be
        kept separate and apart from all other local or municipal functions . . . .
        Although members of a Board of Education in a city perform tasks
        generally regarded as connected with local government, they are officers
        of an independent corporation separate and distinct from the city, created
        by the State for the purpose of carrying out a purely State function and
        are not city officers within the compass of the Constitution's home rule
        provisions. . . . If there be one public policy well-established in this State .
        . . it is that public education shall be beyond control by municipalities and
        politics.  The Board of Education of the City of New York is not a
        department of the city government, it is an independent corporate body.

11 N.Y.2d at 326 (internal quotation omitted).

Recognizing the Court of Appeals admonition that unpublished decisions may not be cited as precedential authority and relying upon *Fay*, the application of the six factor test articulated in *McGinty,* and review of the New York State Education Law, district courts have continued to deny Eleventh Amendment immunity to school districts. *See Simpson v. Enlarged City Sch. Dist. of Newburgh, No*. 05-CV-5144, 2005 WL 2647947 (S.D.N.Y. Sept. 30, 2005); *Hanig v. Yorktown Cent. Sch. Dist.,* 384 F. Supp.2d 710 (S.D.N.Y. 2005); *Cohn v. New Paltz Central Sch. Dist.*, 363 F. Supp.2d 421 (N.D.N.Y. 2005); *Woods v. Cafiero,* No. 04-CV-695, 2005 WL 3871601 (N.D.N.Y. Feb. 7, 2005); *Zahran v. State of N.Y. Dep't of Educ.*, 306 F. Supp.2d 204 (N.D.N.Y. 2004). This Court finds their analysis persuasive.  Accordingly, the School's motion for summary judgment on the ground of Eleventh Amendment immunity is denied.

**Employee Status**

The School District argues that they cannot be subject to liability because plaintiffs are not employees of the School District.  Dkt. #15, pp.8-9.

Plaintiffs respond that the defendants are joint employers and that the School District is at least an aider and abettor to Hopevale as set forth in New York's Executive Law § 296(6).  Dkt. #32, pp.27-29.

"A conclusion that employers are 'joint' assumes that they are separate legal entities, but that they have merely chosen to handle certain aspects of their employer-employee relationships jointly."  *Clinton's Ditch Co-Op Co., Inc. v. National*

*Labor Relations Bd.*, 778 F.2d 132, 137 (2d Cir. 1985), *cert. denied*, 479 U.S. 814

(1986).   "Where this doctrine is operative, an employee, formally employed by one

entity, who has been assigned to work in circumstances that justify the conclusion that

the employee is at the same time constructively employed by another entity, may

impose liability for violations of employment law on the constructive employer, on the

theory that this other entity is the employee's joint employer."  *Arculeo v. On-Site Sales

& Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005).


A joint employer relationship may be found to exist where there is

sufficient evidence that one company had immediate control over another company's

employees.  *National Labor Relations Bd. v. Solid Waste Servs., Inc.*, 38 F.3d 93, 94

(2d Cir. 1994).   In determining immediate control, the court must "weigh whether the

alleged joint employer (1) did the hiring and firing; (2) directly administered any

disciplinary procedures; (3) maintained records of hours, handled the payroll, or

provided insurance; (4) directly supervised the employees; or (5) participated in the

collective bargaining process." *AT&T v. National Labor Relations Bd.*, 67 F.3d 446, 451

(2d Cir. 1995), *citing Clinton's Ditch*, 778 F.2d at 138-39.   "The basis of the finding is

simply that one employer while contracting in good faith with an otherwise independent

company, has retained for itself sufficient control of the terms and conditions of

employment of the employees who are employed by the other employer."  *Clinton's

Ditch,* 778 F.2d at 138, *quoting National Labor Relations Bd. v. Browning-Ferris Indus.

of Pa., Inc.,* 691 F.2d 1117, 1122 (3d Cir. 1982).

In the instant case, it is clear that the School is a joint employer of the plaintiffs.  The School set a separate pay rate for plaintiffs, separately implemented pay increases, included plaintiffs in its bonus program, and subsequently chose to exclude them from their bonus program.  Dkt. #14, Exh. F, p.92 & Exh. G, p.77, 84; Dkt. #24, ¶¶ 21-22.  Although Hopevale did not have a written policy with respect to lunch breaks, a policy was formulated for plaintiffs at the School's request.  Dkt. #16, Exh. I, pp.320-24.  Until July of 2002, plaintiffs' supervisor was Mr. Mangione, who was jointly employed by Hopevale and the School.  Dkt. #17, ¶ 5.  Plaintiffs were also supervised by the School Principal, Jim McGowan, followed by the School's Assistant Principal, Mr. Regula.  Dkt. #20, Exh. 6, p.19; Dkt. #33, ¶¶ 25, 121 & Exh. 1, 2.  School Superintendent Joseph Caliguri was also directly involved in the supervision of plaintiffs' work, as evidenced by his presence at meetings with and memorandums to plaintiffs.  Dkt. #33, Exh. 2; Exh. 7, p.99.  This evidence is sufficient to defeat the School's argument that they should not be considered plaintiffs' employer.

**Statute of Limitations**

The defendants argue that plaintiffs have failed to demonstrate a continuing violation and, therefore, the three hundred day limit would bar any allegations preceding October 5, 1999.  Dkt. #15, pp.6-7; Dkt. #19, pp.4-5.

Plaintiffs respond that they have shown a continuing violation, which would permit consideration of all conduct amounting to a discriminatory practice or policy.  Dkt. #32, pp.17-18.

"An aggrieved employee wishing to bring a Title VII claim in district court must file an administrative complaint with the EEOC within 300 days of the alleged discriminatory act." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 219 (2d Cir. 2004); *see EEOC v. Commercial Office Products Co.*, 486 U.S. 107, 110 (1988) ("If a complainant initially institutes proceedings with a state or local agency with authority to grant or seek relief from the practice charged, the time limit for filing with the EEOC is extended to 300 days."), *citing* 42 U.S.C. § 2000e-5(e).   The same 300 day time period applies for charges brought pursuant to the ADEA.  *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997), citing 29 U.S.C. §§ 626(d) & 633(b).   Since plaintiffs initially filed their complaints with the NYSDHR, an agency with such authority, they had 300 days to file their complaint with the EEOC.  *See Ford v. Bernard Fineson Dev. Ctr*, 81 F.3d 304, 307 (2d Cir. 1996).   Thus, any discriminatory act occurring more than three hundred days before plaintiffs' August 1, 2000 filing with the NYSDHR, *i.e.,* before October 5, 1999, would be untimely for purposes of plaintiffs' federal causes of action, unless an exception applies.

The Court of Appeals for the Second Circuit has recognized a continuing violation exception to both Title VII and ADEA claims.  *Lightfoot*, 110 F.3d at 907. Pursuant to that exception, "a plaintiff who files a timely EEOC charge about a particular discriminatory act committed in furtherance of an ongoing policy of discrimination extends the limitations period for all claims of discriminatory acts committed under that policy even if those acts, standing alone, would have been barred by the statute of limitations."  *Id.*   Discrete incidents of discrimination that are unrelated

to an identifiable policy or practice, will not ordinarily amount to a continuing violation unless such incidents are specifically related and are allowed to continue unremedied for so long as to amount to a discriminatory policy or practice.  *Id.*

For claims of hostile work environment, a charge will be timely so long as it is filed within 300 days of any act that is part of the hostile work environment. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002).  Provided that an act contributing to the hostile work environment claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.  *Id.* at 117.

Whether parsed as a continuing violation or a hostile work environment, the Court concludes that because plaintiffs allege that Mr. McGowan frightened them by failing to announce his presence on a regular basis until his retirement in 2001, all of plaintiffs' allegations regarding such conduct are timely.  The remainder of plaintiffs' allegations, including their claim of pay disparity, set forth discrete occurrences subject to the 300-day statute of limitations extending back to October 5, 1999.  *See Lightfoot*, 110 F.3d at 907 (rejecting claim that defendants' failure to pay plaintiff at an appropriate salary level should be treated as a continuing violation).

Unlike Title VII's 300-day rule, claims brought pursuant to New York's Human Rights Law must be filed in court within three years of the alleged discriminatory act.  *Lightfoot,* 110 F.3d at 907; *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708,

714 (2d Cir. 1996); *see* N.Y. CPLR § 214(2); N.Y. Exec. Law § 297(9).   Moreover, the

statute is tolled during the pendency of any complaint that is filed with the NYSDHR.

*Penman v. Pan American World Airways, Inc*., 69 N.Y.2d 989, 990-91 (1987).   In the

instant case, plaintiffs' filed their complaint with the NYSDHR on August 1, 2000 and

received their Notice of Dismissal on October 3, 2001 with respect to Hopevale, and

October 29, 2001, with respect to the School.   Thus, 429 and 455 days of the statute of

limitations are tolled.   Plaintiffs' filed their federal lawsuit on January 2, 2002.   Dkt. #1.

As a result, plaintiffs' state law claims incorporate any allegations against Hopevale

which are  subsequent to October 29, 1998 and any allegations against the School

which are subsequent to October 3, 1998.


**Title VII of the Civil Rights Act**

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment

practice for an employer . . . to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).


In the absence of direct evidence of discrimination, Title VII claims are

analyzed pursuant to the burden-shifting framework set forth in *McDonnell Douglas*

*Corp. v. Green*, and its progeny.   411 U.S. 792, 802 (1973).   This analysis requires that

plaintiffs establish a *prima facie* case of discrimination by showing that: (1) they belong

to a protected class; (2) they were qualified for the position; (3) they suffered an

adverse employment action; and (4) the circumstances of the adverse action give rise

-28-

to an inference of discrimination on the basis of her membership in that class.  *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir. 2003); *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 91-92 (2d Cir.), *cert. denied*, 534 U.S. 951 (2001); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir. 2000), *cert. denied,* 540 U.S. 811 (2003); *Chambers v. TRM Copy Centers Corp*., 43 F.3d 29, 37 (2d Cir. 1994).  The burden on the plaintiff at this stage of the analysis is *de minimis.  Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981).  Evidence of discrimination is not required.  *James v. New York Racing Assoc.*, 233 F.3d 149, 153 (2d Cir. 2000).

If plaintiffs meet this initial burden and establish a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for the employment action.  *Id.; see Burdine,* 450 U.S. at 254.  "Any such stated purpose is sufficient to satisfy the defendant's burden of production; the employer does not have to persuade the court that the stated purpose was the actual reason for its decision."  *Austin v. Ford Models, Inc*., 149 F.3d 148, 153 (2d Cir. 1998), *abrogated on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 509 (2002).

If the employer carries this burden of production, the presumption raised by the *prima facie* case is rebutted and "simply drops out of the picture."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993).  At this point, the case "becomes like any other case in that the plaintiff[s], in order to prevail, must have evidence from which the factfinder can reasonably find the essential elements of the claim."  *James*, 233

F.3d at 154.  Accordingly, in the context of a motion for summary judgment, the Court must examine the entire record to determine whether the plaintiffs could satisfy their ultimate burden of persuading the trier of fact that the defendants intentionally discriminated against them.  *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000). The plaintiffs must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendants were false, and that more likely than not discrimination was the real reason for the employment action.  *Weinstock,* 224 F.3d at 42.

Discrimination claims brought pursuant to the NYSHRL are analyzed in the same manner as claims brought pursuant to Title VII.  *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000).

**ADEA**

The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age."  29 U.S.C. § 623(1)(1).  The class protected by this statutory prohibition is limited to persons 40 years of age or older.  29 U.S.C. § 631.  Plaintiffs were over forty during the time period relevant to this complaint.  Dkt. #24, ¶ 3.

In the absence of direct evidence of discrimination, ADEA claims are analyzed pursuant to the burden-shifting framework set forth in *McDonnell Douglas* for Title VII claims.  *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).  To

establish a *prima facie* case of age discrimination under the ADEA, plaintiffs must demonstrate that: (1) they were within the protected age group; (2) they were qualified for the position; (3) they were subject to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *See Terry*, 336 F.3d at 137-38.   Age discrimination claims brought pursuant to the NYSHRL are analyzed in the same manner as claims brought pursuant to the ADEA.  *See Smith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999).

## Disparate Treatment with Respect to Pay

Plaintiffs seek summary judgment on their claims of sex discrimination under Title VII and the NYSHRL as evidenced by disparate pay, particularly with respect to overtime.[5]  Dkt. #21, pp.18-20.

Hopevale argues that plaintiffs have failed to demonstrate a *prima facie* case of disparate treatment with respect to pay because maintenance workers perform substantially different work than cleaners and because the pay scale for cleaners and maintenance workers is age and gender neutral in form and as applied.  Dkt. #19, pp.9,13-14.  Hopevale asserts that Mr. Murphy was assigned cleaning duties because the plaintiffs were unavailable and that his assignment afforded Hopevale significant cost savings.  Dkt. #19, p.8.

---

[5] Although counsel references the Equal Pay Act in their papers, plaintiffs' complaint does not assert a claim pursuant to 29 U.S.C. § 206, the Equal Pay Act.

The School District argues that it has presented legitimate business reasons for the alleged disparate treatment and that plaintiffs have failed to meet their burden to show that these reasons are pretextual.  Dkt. #15, p.2.

In order to make out a *prima facie* case of unequal pay for equal work, plaintiffs must show: (1) they are members of a protected class; (2) they were paid less than non-members of their class for work requiring substantially the same responsibility; and (3) evidence of discriminatory animus.  *Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir. 1999).  "A showing of disparate treatment – that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside [her] protected group' – is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case."  *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003), *quoting Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).

Plaintiffs point to John Borowski and Ray Murphy as evidence of pay discrimination.  Dkt. #21, p.19.  Specifically, plaintiffs assert that Mr. Borowski started at approximately $0.50 per hour more than plaintiffs, shirked his cleaning responsibilities so that plaintiffs were forced to pick up the slack, yet continued to be paid at a higher rate than plaintiffs.  Dkt. #21, p.19.  Plaintiffs also note that Mr. Murphy was elevated to the title of Maintenance Worker shortly after he became a cleaner, where he makes more than plaintiffs for doing less.  Dkt. #21, pp.19-20.  Despite his job title, plaintiffs claim that Mr. Murphy's job responsibilities are that of a cleaner.  Dkt. #19, p.20.

-32-

Initially, the Court notes that plaintiffs allegations with respect to John Borowski, who resigned in 1988, are clearly barred by the statute of limitations. With respect to Mr. Murphy, who was classified as a cleaner as of October of 1998, the most remote time period included within the NYSHRL statute of limitations, plaintiffs were earning $8.86 per hour from Hopevale while Mr. Murphy was earning $6.65 per hour. Dkt. #20, Exh. 15-16 & 18. When Mr. Murphy was transferred to the position of maintenance worker on July 1, 1999, he earned $8.77 per hour, while plaintiffs continued to earn $8.86 per hour. Dkt. #20, Exh. 15-16 & 18. It was not until Mr. Murphy received an increase to $9.03 per hour on July 1, 2000, when plaintiffs were still earning $8.86 per hour, that Mr. Murphy's rate of pay exceeded plaintiffs. Dkt. #20, Exh. 15-16 & 18.

Although Mr. Murphy was earning a larger hourly salary than plaintiffs as of July 1, 2000, it is clear that by that time, his job duties as a maintenance worker were substantially different from plaintiffs responsibilities as a cleaner. While Mr. Murphy continues to perform cleaning duties, he is also responsible for the proper upkeep and operation of the physical plant of Hopevale, including minor repairs to the buildings and equipment, contracting of larger repairs, snow removal and lawn care. Dkt. #17, ¶¶ 17-19; Dkt. #30, Exh. 2, ¶¶ 6-19. The Court notes that plaintiffs do not allege that they are qualified to undertake these additional responsibilities nor do they allege that they requested promotion to a maintenance position. Thus, plaintiffs cannot compare themselves to Mr. Murphy for purposes of their claim of pay discrimination.

In addition, because Mr. Murphy performs his duties during the work day so as to be available should there be any maintenance issues during normal business hours, he is available to clean the Family Activity Center before this building is opened for the day.  Dkt. #17, ¶¶ 17-19, 29.  Since plaintiffs are already working for Hopevale during this time period, Hopevale has proffered a legitimate, nondiscriminatory reason for offering this overtime opportunity to Mr. Murphy rather than plaintiffs.  Because plaintiffs concede that they never approached Hopevale to request the opportunity to clean the Family Activity Center, they cannot demonstrate that Hopevale's reason was pretextual.  Dkt. #16, Exh. H, pp.339-342.  Accordingly, plaintiffs' motion for partial summary judgment on their claim for disparate treatment with respect to pay is denied and defendants' motions for summary judgment with respect to these claims are granted.

### Hostile Work Environment

The School argues that plaintiffs cannot demonstrate that the allegedly offending behavior was the result of discriminatory animus with respect to their age or sex or that they were subject to sufficiently severe or pervasive treatment as to alter the conditions of their employment.  Dkt. #15, pp.1-3; Dkt. #19, pp.12-13.  The School asserts that plaintiffs held the same job, did the same work, on essentially the same schedule, for increasing pay and received excellent evaluations.  Dkt. #15, p.4.

Hopevale argues that plaintiffs have failed to demonstrate that the conditions and privileges of their employment were adversely affected by Hopevale or

its agents.  Dkt. #19, p.7.  Hopevale also argues that Mr. Mangione's alleged

comments, which he denies, are insufficient to establish a *prima facie* case and that the

alleged conduct is not sufficiently severe or pervasive to demonstrate a hostile work

environment.  Dkt. #19, pp.9-10, 12.


Plaintiffs respond that Mr. McGowan's stalking behavior, at a time when

the School and plaintiffs were aware of complaints of sexual harassment against Mr.

McGowan, created a hostile work environment.  Dkt. #32, pp.20-22.  Plaintiffs also

respond that remarks by Mr. Mangione and Mr. McGowan to the effect that plaintiffs

were "getting old" and had to be able to "bend and stretch" are sufficient to demonstrate

a hostile work environment based on plaintiffs' age.  Dkt. #32, p.22.


Plaintiffs claims are not limited to economic or tangible discrimination, but

encompass the entire spectrum of disparate treatment, including claims of

discriminatorily hostile or abusive work environments.  *Harris v. Forklift Systems*, 510

U.S. 17, 21 (1993).  Thus, Title VII and the ADEA are violated when the workplace is

permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe

or pervasive to alter the conditions of the victims employment and create an abusive

working environment.  *Id.*  However, "[c]onduct that is not severe or pervasive enough

to create an objectively hostile or abusive work environment – an environment that a

reasonable person would find hostile or abusive – is beyond [the statutes'] purview."  *Id.*

In assessing the existence of a hostile work environment, the Court considers the

totality of the circumstances, including "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

Plaintiffs must also demonstrate that they were subjected to the hostility because of their membership in a protected class, *e.g.*, their age or sex. *Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999). Because everyone can be characterized by age or sex, and many bosses are harsh, unjust and rude, "[i]t is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002). "Otherwise, the federal courts will become a court of personnel appeals." *Id.*

In the instant case, plaintiffs have failed to demonstrate that they were subjected to a hostile work environment because of their age or sex. Although plaintiffs complained that Mr. McGowan frightened them when he appeared in the building after hours, they concede that he never made sexual advances, asked for sexual favors, or physically touched them. Dkt. #16, Exh. G, pp.553-54 & Exh. H, pp.72-73, 82 & Exh. I, pp.129-30. Plaintiffs complained and expressed similar security concerns about other employees entering the building after hours. Dkt. #33, Exh. 1 & 3. The 1997 comment by Mr. Mangione and Mr. Regula is time barred and, even if considered along with Mr. Mangione's subsequent comment regarding plaintiffs' age and flexibility and his suggestion that plaintiffs were sunbathing while Mr. Dobry was working hard, cannot be

considered anything more than isolated remarks.  Dkt. #14, Exh. C, pp.596-97 & Exh. D, p.344; Dkt. #33, ¶ 32 & Exh. G, pp.564-65 & Exh. H, pp.143-44.  Accordingly, defendants' motions for summary judgment with respect to plaintiffs' claims of a hostile work environment are granted.


## Retaliation

Plaintiffs seek summary judgment on their claim of retaliation.  Dkt. #21.  In support of this motion, plaintiffs argue that defendants retaliated against them by removing plaintiffs from cleaning Building 20, promoting Mr. Murphy to maintenance worker at a higher salary, offering Mr. Murphy overtime to clean the Family Activity Center, denying plaintiffs access to policy and procedure meetings, and adding security duties to plaintiffs' job responsibilities.  Dkt. #21, pp.20-23.  Plaintiffs argue that they

> did not start experiencing significant problems in the work place until they raised the issue of harassment by Mr. McGowan.  Only then did Defendants attempt to combine their hours at the lower rate of pay, take Building 20 away from them, give overtime cleaning hours to the maintenance man because they filed EEOC charges.  Accordingly, Plaintiffs have established retaliatory conduct on the part of Hopevale that should not be tolerated by this Court.

Dkt. #21, p.24.


The defendants seek summary judgment dismissing plaintiffs' retaliation claims on the ground that plaintiffs have failed to demonstrate any materially adverse change in the terms and conditions of their employment following the filing of their claim with the EEOC.  Dkt. #15, pp.4-5; Dkt. #19, pp.14-15.  The defendants also argue that plaintiffs have failed to establish any causal connection between the allegedly

retaliatory acts and the filing of the EEOC charge.  Dkt. #15, pp.5-6; Dkt. #19, pp.14-15.

Plaintiffs respond that defendants retaliated against them by attempting to combine their hours at Hopevale's lower rate of pay, reassigning responsibility for Building 20, denying them the opportunity to earn overtime cleaning the Family Activity Center, instituting the Cleaning Service Reports to make it appear that they were not doing their jobs, formally evaluating plaintiffs, imposing security duties, and ordering plaintiffs to clean up the sewage backup without affording them protective equipment. Dkt. #32, pp.26-27.

In order to establish a *prima facie* case of retaliation under Title VII or the ADEA, plaintiffs must show: (1) participation in a protected activity known to the defendants; (2) an employment action disadvantaging the plaintiffs; and (3) a causal connection between the protected activity and the adverse employment action.  *Terry*, 336 F.3d at 141.  Complaining of discrimination to one's supervisor constitutes protected activity.  *Cruz*, 202 F.3d at 566.  "An adverse employment action is a 'materially adverse change' in the terms and conditions of employment."  *Fairbrother v. Morrison*, 412 F.3d 39, 56 (2d Cir. 2005).  "[S]uch an action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.* (internal quotes omitted).  "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  *Id.* (internal quotation omitted).  An unsatisfactory evaluation or counseling memo with respect to

job performance is insufficient, without more, to constitute an adverse employment action. *Id.* at 56-57. The causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action. *See Feingold v. New York*, 366 F.3d 138, 156-57 (2d Cir. 2004).

Initially, the Court notes that plaintiffs' allegations regarding the proposed consolidation of their schedule in 1997 are untimely. Even if they were timely, the proposal was never implemented. Dkt. #24, ¶ 34; Dkt. #30, Exh. 10, p.76 & Exh. 11, p.32. Similarly, when plaintiffs' complained about the School's request that they turn the lights off when they were not working in a particular area, they were permitted to leave the lights on. Dkt. #20, Exh. 8, No.18; Dkt. #33, Exh. 2.

With respect to the reassignment of cleaning duties for Building 20 to Mr. Murphy in March of 1999, which is timely only for purposes of the NYSHRL, plaintiffs concede that they had previously expressed concern to Mr. Perry about their ability to complete their cleaning duties during their scheduled hours and the record reflects that while plaintiffs had been receiving overtime for these duties, Mr. Murphy performs these duties as part of his regular work week. Dkt. #16, pp.45-46; Dkt. #17, ¶¶ 26-27; Dkt. #30, Exh. 2, ¶ 20 & Exh. 9, p.355 & Exh. 11, p.328. Plaintiffs have failed to proffer evidence that Hopevale's economic rationale was pretext for intentional discrimination. Similarly, as set forth in the Court's discussion of plaintiffs' claim of disparate treatment, plaintiffs have failed to proffer evidence of intentional discrimination to question Hopevale's reason for offering Mr. Murphy overtime hours to clean the Family Activity Center, *to wit*, plaintiffs are already working for Hopevale during the time period that this

building is cleaned.

While plaintiffs perceive the Cleaning Service Reports as an attempt to make it appear that they were not doing their jobs, there is no indication that plaintiffs have been subjected to any form of discipline as a result of this new procedure.  Dkt. #33, Exh. 3 & 4.  Similarly, there is no allegation of any criticism regarding the work plaintiffs logged during Easter break in 2001.  Dkt. #33, Exh. 2.  In addition, plaintiffs' evaluations, which Mr. Mangione explained were required by the Joint Commission and Accreditation, Health Care Organization, were good or above in every category evaluated.  Dkt. #14, Exh. H; Dkt. #24, ¶ 35.

It is clear that plaintiffs were not properly trained or equipped to clean the mess from the sewer back up.  Dkt. #33, Exh. 16.  There is no indication, however, that plaintiffs were denied such training and equipment or assigned this task in retaliation for their complaints.  As plaintiffs themselves note, Mr. Dobry had been asked to clean the mess from a sewer back up one week prior to this incident.  Dkt. #33, ¶ 119.

Finally, while plaintiffs complain that they have been assigned security duties, the record reveals that, in response to their concerns about staff failing to lock doors and close windows, they have been asked to check that the doors and windows of the School are closed and locked at the beginning of their workday.  Dkt. #33, Exh. 2. This additional responsibility is insufficient to demonstrate an adverse employment action.

As plaintiffs have failed to demonstrate any adverse employment action

flowing from their complaints or any causal connection between their complaints and the alleged retaliatory actions, plaintiffs' motion for partial summary judgment on their retaliation claim is denied and defendants' motions for summary judgment are granted.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that plaintiffs' motion (Dkt. #20), for partial summary judgment is **DENIED** and defendants motions (Dkt. ##14, 16), for summary judgment are **GRANTED**.

The Clerk of the Court is directed to enter judgment in favor of defendants.

**SO ORDERED.**

S/ H. Kenneth Schroeder, Jr.
H. KENNETH SCHROEDER, JR.
United States Magistrate Judge

DATED:    Buffalo, New York
          June 6, 2006